STOULIG, Judge.
Plaintiff, B & G Crane Service, Inc., doing business as Sun Erection Company, was awarded an $869 judgment against defendant,[1]- Lamastus & Associates, Inc., representing the balance due for remedial iron and steel work. Defendant contends we should reverse because the trial judge admitted parol evidence to alter and contradict the terms of a written contract contrary to the provisions of C.C. art. 2276, which provides:
“Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.”
Defendant, as general contractor of the Star Chrysler building, entered into a written agreement to subcontract to plaintiff the erection of the structural steel. The extent of the work plaintiff was obliged to perform was set forth in Section 5. We quote:
“SECTION 5 — STRUCTURAL STEEL —COMPLETE NO EXCEPTIONS AS APPLICABLE TO STRUCTURAL STEEL ERECTION. This subcontract agreement includes specifically the unloading, erecting, aligning, plumbing and welding of the structural steel for the new service building, the two steel stairs and the railing on the roof of the new service building.
Sun Erection Co., Inc. is to receive all materials F.O.B. Truck Delivery Job Site, tentative delivery May 24, 1971. All grouting, field painting and testing is excluded except cost of retesting due to original work not meeting specifications and cost of certification of welders. This subcontract agreement does not include the furnishing of any material that *517 forms a permanent part of this job other than welding rods.”
The contract also provided:
“(b) This subcontract contains the entire agreement between the parties and all additions thereto or changes therein shall be in writing and shall not be binding unless same are in writing.”
The steel furnished plaintiff by the defendant was ordered from Howell Steel in Jackson, Mississippi. Most of it was defective on arrival and required aligning, straightening and welding to conform to the contract specifications.[2]
Arleigh Hays, plaintiff’s estimator, explained that the original contract did not contemplate remedial work of the material furnished. While he was aware the contract recited written authorization for “additions,” he did the remedial work at the verbal request of James Wishardt, defendant’s superintendent on the job. He explained the general contract was virtually completed and rather than delay the project waiting for written approval and consultation with the steel supplier, he “took the man [Wishardt] at his word” and agreed to undertake the straightening on verbal authorization.
At the time of the trial, Wishardt was no longer employed by defendant; he was working for a firm in Slidell, Louisiana, and was not available to appear. Defendant’s president, Ray Lamastus, testified he instructed Wishardt and Huey Breaux, his office engineer, to authorize no extra work verbally, and specifically in the case of the defective railing, to hold up the job until the matter was settled with the fabricator.
Lamastus acknowledged that he at no time communicated these thoughts directly to plaintiff’s representatives, and his testimony is somewhat vague as to how often he was on the job site while the remedial work was underway. The trial judge found these facts which we quote from his written reasons for judgment:
“The evidence is quite clear. Plaintiff had nothing to do with supplying the handrails; its job was simply to erect them. As delivered, the rails were defective and had to be remedied before they could be used. The remedial work was done by the plaintiff. The job superintendent and project engineer for the general contractor knew an extra was to be incurred; they saw the work being done and authorized it, if not specifically, then certainly tacitly. Neither the superintendent nor the engineer stopped the work or instructed the plaintiffs not to proceed with the extra work until written authorization for it was given.”
We do not view the Sun remedial work as an addition to or a change in the original contract, because the written agreement is restricted solely to the erection of fabricated steel to be furnished by the general contractor. As we view it, Wishardt’s request that plaintiff remedy the defective material was beyond the scope of the subcontract[3] and constituted a separate verbal contract which was proved by the uncontradicted testimony of plaintiff’s representatives.
At the time the original agreement was signed both plaintiff and defendant were assuming the material would be supplied to the job in a usable condition. When it arrived in a defective state as the contract neared completion, a situation presented itself that had not been foreseen at the time the written agreement was signed. Had defendant engaged another *518 local subcontractor to remedy» the defects rather than returning it to the fabricator, there would be no question that it entered into a separate agreement for the performance of this job. The fact that plaintiff had the steel-erecting subcontract prior to undertaking the remedial work — the responsibility of the supplier — would not then change the character of the new service from a separate contract to an addendum on the original. We therefore think the trial court properly admitted parol evidence and plaintiff proved defendant’s indebtedness by a preponderance of the evidence.
For the reasons assigned, the judgment appealed from is affirmed, costs to be borne by the appellant.

Affirmed.

SCHOTT, J., concurs with written reasons.

. Ray Lamastus, president of Lamastus & Associates, Inc., was cited individually as a defendant. An exception of no cause of action was properly maintained. Chrysler Realty Corporation was cited as a defendant because it owned the building into which the iron and steel were incorporated; however it was never served with a copy of the petition. The suit against it was severed.

. The pipes warped when subjected to the hot dip process of galvanizing. They were guard rails which were to slip into sleeves embedded in concrete. In order to align the bent pipes with the sleeves it was necessary to heat and straighten them.

. The subcontract involved erection of fabricated steel, whereas the remedial work is to overcome a deficit in the processing by the supplier in its fabrication.